# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:08cv240-RJC

|  |  |
|---|---|
| **MEINEKE CAR CARE CENTERS, INC.,** | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **RLB HOLDINGS, LLC, JOE E. BAJJANI A/K/A JOE BAJJANI, & MICHELLE G. BAJJANI A/K/A MICHELLE BAJJANI,** | ) |
| **Defendants.** | ) |
|  | ) |

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiff's Future Damages Claim and Memorandum in Support (Docs. No. 25 & 25-2), Plaintiff's Response (Doc. No. 28), and Defendants' Reply (Doc. No. 33); and Plaintiff's Motion for Summary Judgment and Memorandum in Support (Docs. No. 26 & 26-12), Defendants' Response (Doc. No. 32), and Plaintiff's Reply (Doc. No. 34). After reviewing arguments by the parties and appropriate case law, the Court GRANTS Defendants' Motion for Partial Summary Judgment (Doc. No. 25), and GRANTS in part and DENIES in part Plaintiffs' Motion for Summary Judgment (Doc. No. 26).

## I.     FINDINGS OF FACT

This suit arises out of contracts between Plaintiff Meineke Car Care Centers, Inc., ("Meineke") and Defendants, RLB Holdings, LLC ("RLB"), Joe H. Bajjani ("Mr. Bajjani") and Michelle G. Bajjani ("Mrs. Bajjani") (collectively "Defendants"). RLB is a corporate entity owned and operated primarily by Mr. Bajjani and formed for purposes of operating Meineke franchises. These contracts all relate to the sale and operation of four franchises.

Meineke enters into franchise agreements with parties to establish and operate automotive repair shops under a standard, uniform system developed by Meineke. Franchise and Trademark Agreements ("FTA"s) govern the franchise relationship and grant franchisees the right to use Meineke's federally registered trademark, logo, and other proprietary marks.

In December 2001, Meineke entered into an FTA with Mr. Bajjani, which granted Mr. Bajjani the right to operate a Meineke Shop (Shop No. 1660). Subsequently Mr. Bajjani added Mrs. Bajjani as a franchisee. In May 2002, Meineke entered into an Assignment of FTA with Mr. and Mrs. Bajjani, which assigned Shop No. 1660 to RLB.

Defendants entered into subsequent FTAs with Meineke on July 2, 2002 (Shop No. 1661), in March 2005 ( Shop No. 1886), and in June 2005 (Shop No. 1889). Mr. and Mrs. Bajjani executed Owners' Personal Guaranties when they signed each respective Shop's FTA whereby they agreed to guarantee RLB's performance and obligations under the each of the four FTAs.

In January 2006, RLB entered into a Sales Contract with AEB Holding LLC ("AEB"), a South Carolina limited liability company, whereby Defendants sold the business and goodwill of Shop No. 1886 to AEB. (Ex. 10).[1] Defendants then entered into an Equipment Rental Contract with AEB whereby Defendants agreed to rent the automotive equipment installed and located at Shop No. 1886 to AEB. (Ex. 11). Mr. Bajjani signed a Limited Guaranty Agreement, agreeing to guaranty AEB's performance and obligations under the 1886 AEB Franchise Agreement. Mr. Bajjani's Guaranty ended at the earlier of either AEB completing the purchase of the assets of Shop No. 1886 or three years from Mr. Bajjani's execution of the Guaranty. (Ex. 12). In April 2006, Meineke

[1]Exhibits refer to the hard copies given to the Court by the parties that were originally attached to the state court complaint.

entered into a FTA with AEB for Shop No. 1886 and included an Owners' Personal Guaranty making Michael P. Levasseur the personal guarantor of Shop No. 1886. (Ex. 13).

Under the terms of the FTAs, Defendants and AEB agreed to: (i) pay Meineke on a weekly basis a continuing franchise fee, or royalty, at the rate of seven percent (7%), five percent (5%), four percent (4%), or three percent (3%) of the Shops' gross revenues based on the type of product or service sold (Exs. 1, 5, 8, and 13 at Article 3.2); (ii) pay weekly advertising contributions in an amount equal to eight percent (8%) of the Shops' gross revenues (Id. at Article 3.4); and (iii) furnish Meineke with accurate weekly business reports of the Shops' gross sales (Id. at Article 9.3). In exchange, Defendants and AEB became licensed to: (i) operate automotive repair shops under the trademark "Meineke;" (ii) display the Meineke name, logo, and marks; (iii) receive training and access to Meineke's methods, procedures, and techniques; and (iv) participate in an established network of licensed muffler, exhaust, and brake repair shops.

## A. Termination of Shops

### 1. Shop No. 1660

Defendants closed Shop No. 1660 for good on January 16, 2006. (Doc. No. 34-4 at 22). Defendants claim that Meineke made a deal and allowed them to close Shop No. 1660 in exchange for converting and opening Shop No. 1889.[2] (Id. at 3-6).

Meineke learned in late March 2006 that Defendants previously closed Shop No. 1660. Shop No. 1660 had a positive net income during its first operational year but was not profitable during its

---

[2]Meineke and Defendants signed a Conversion Agreement which sets forth the terms of Defendants' acquisition of Shop No. 1889 and the Shop's conversion to a Meineke Shop. (See Ex. 9). The Conversion Agreement contains a merger clause which establishes that all of the terms relating to the conversion of Shop No. 1889 are memorialized in the FTA. (Id. at ¶11). The Conversion Agreement, however, does not contain any language regarding the early termination of the FTA for Shop No. 1660 being consideration for Defendants' purchase and conversion of Shop No. 1889 to a Meineke shop.

second calendar year of 2006. Meineke sent Defendants a letter on April 4, 2006, notifying Defendants that if they decided to close Shop No. 1660 prior to July 10, 2017, the date of the expiration of the FTA, the closure would be an abandonment of the Shop and a breach of contract. (Ex. 14). Defendants failed to respond to Meineke's letter, and on November 15, 2007, Meineke sent Defendants a letter, notifying them of the termination of the 1660 FTA effective January 16, 2006.

### 2. Shop No. 1661

Defendants closed Shop No. 1661 in December 2006, and informed Meineke they intended to relocate Shop No. 1661. Mr. Bajjani asserted in his deposition that Shop No. 1661 had problems with the city's sign ordinance which changed a few weeks before Shop No. 1661 opened. The new ordinance required black and white signage instead of Meineke's yellow and red colors or its trademark. (Doc. No. 34-4 at 6). The city disconnected the power, issued violation notices, and revoked Shop No. 1661's sign permit. Mr. Bajjani testified that after the store opened without the proper signage "performance was poor right from the beginning." (Id. at 6).

On January 9, 2007, Meineke sent Defendants a Closed Center Agreement outlining Meineke's proposed terms to allow Defendants to relocate Shop No. 1661. (Ex. 16). Defendants responded on February 5, 2007, expressing concerns regarding the terms of the Closed Center Agreement. (Ex. 17). Meineke sent a modified Closed Center Agreement to Defendants on February 15, 2007 (Ex. 18), but Defendants neither responded nor reopened Shop No. 1661. On November 15, 2007, Meineke notified Defendants that the FTA for Shop No. 1661 terminated effective December 10, 2006. (Ex. 19).

### 3. Shop No. 1886

AEB entered into a Sales Contract with RLB in January, 2006. The landlord evicted AEB from the premises of Shop No. 1886 on September 24, 2006, so AEB operated the store for approximately nine months. (Doc. No. 34-7). Shop No. 1886 had a negative net income for both 2005 and 2006. Meineke claims that Mr. Bajjani is liable for AEB's defaults pursuant to the terms of the Limited Guaranty. At the time of AEB's eviction, AEB owed Meineke a number of weeks of unpaid franchise fees and advertising contributions. Meineke sent AEB and Mr. Bajjani a Notice of Default on January 18, 2007, but neither party cured the defaults. (Ex. 20). On November 15, 2007, Meineke notified Defendants that the FTA for Shop No. 1886 was terminated effective September 24, 2006. (Ex. 21).

### 4. Shop No. 1889

Shop No. 1889 was profitable during its first operational year, 2005, but the Shop had a negative net income the subsequent year. Shop No. 1889 had a profitable net income during 2007 and a negative net incomes for the next two years. Defendants closed Shop No. 1889 in August 2007, and did not reopen for business. On November 15, 2007, Meineke terminated Defendants' Shop No. 1889 FTA effective August 1, 2007. (Ex. 22).

### B. Parties' motions for summary judgment

Defendants seek summary judgment on the Plaintiff's claim for loss of prospective fees. Meineke seeks summary judgment on the allegations that Defendants breached the FTA entitling Meineke to (1) amounts owed by Defendants for unpaid royalties, advertising contributions, and merchandise account debt at the time of termination and (2) lost future franchise fees and advertising contributions. Meineke also seeks summary judgment against Defendants' counterclaims for breach

of contract and breach of the duty of good faith and fair dealings.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, No. 07-1428, slip op. at 26, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

6

## III.    LOSS OF PROSPECTIVE FEES

Meineke alleges that Defendants' breaches and defaults have directly and proximately caused Meineke to lose future royalties and advertising contributions it would have received during the remaining terms of the FTA for Shop Nos. 1660, 1661, 1886, and 1889.  Meineke contends that once a franchise is terminated, it takes Meineke approximately three years to re-franchise the terminated franchisee's market area and/or business performance.  Meineke claims that it is entitled to payments under the FTAs that Defendants would have paid but for Defendants' breach.  Meineke calculated that future franchise fees and advertising contributions would total $289,136.01 for Shop Nos. 1660, 1661, and 1889.  Additionally, Meineke seeks future damages from Mr. Bajjani as Guarantor for the Shop 1886 AEB Franchise Agreement for the remainder of their three-year guaranty, totaling $60,799.82.

Defendants in turn seek summary judgment on Meineke's loss of prospective fees claim based on the fact that: (1) Meineke's FTA does not provide for the recovery of prospective profits or royalties; (2) Meineke cannot and has not proved that future royalties and profits would have been realized; (3) Meineke's decision to terminate Defendants' FTAs, not Defendants' alleged breach, proximately caused the damages sought by Meineke; and (4) Meineke failed to mitigate its alleged damages.

Defendants have the better argument.  In fact Meineke failed to bring to the court's attention it had twice unsuccessfully asserted its prospective damages claim in this district.  See Meineke Car Care Centers, Inc. v. L.A.D. 1603, No. 3:08cv73, 2008 U.S. Dist. LEXIS 33566, *3 (W.D.N.C. Apr. 23, 2008) (In default judgment context, Judge Martin Reidinger rejected lost profits theory: "Any percentage of zero is zero."); Meineke Car Care Centers, Inc. v. Duvall, No. 3:06cv180, 2007 U.S.

Dist. LEXIS 27120, *1-2 (W.D.N.C. Apr. 12, 2007) (Against *pro se* plaintiff, Judge Frank D. Whitney found a "gaping hole" in Meineke's proof of prospective damages). For reasons that follow, Meineke's argument is a swing and a miss, strike three.[3]

In North Carolina, the elements of breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." <u>Poor v. Hill</u>, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). A breach of contract is only actionable if a material breach occurs – one that "substantially defeat[s] the purpose of the agreement" or goes "to the very heart of the agreement," or can be "characterized

---

[3]<u>See</u> Kenny Rogers, *The Greatest, on* She Rides Wild Horses (Dream Catcher 1999):

> little boy in a base ball hat
> stands in the field
> with his ball and bat . . .
> and the ball goes up and the ball comes down
> swings his bat all the way around
> the world so still you can hear the sound
> the baseball falls to the ground
> now the little boy doesn't say a word
> picks up his ball he is undeterred
> says I am the greatest there has ever been
> and he grits his teeth
> and he tries it again
> and the ball goes up and the ball comes down
> swings his bat all the way around
> the world so still you can hear the sound
> and the baseball falls to the ground
> he makes no excuses
> he shows no fear
> he just closes his eyes and listens to the cheers
> says I am the greatest when the game is on the line
> and he gives his all one last time
> and the ball goes up the moon so bright
> swings his bat with all his might
> the world's as still as it can be
> and the baseball falls
> and that's strike three . . .
> says i am the greatest that is understood
> but even I didn't know
> I could pitch that good

Perhaps on appeal, Meineke will demonstrate it is the greatest pitcher the world has ever seen. But not here.

as a substantial failure to perform." <u>Fletcher v. Fletcher</u>, 474 S.E.2d 802, 807-08 (N.C. Ct. App. 1996) (internal quotation marks omitted). The four FTAs were valid contracts between Defendants and Meineke. Defendants breached these contracts by prematurely closing the Shops. Closing the Shops substantially defeated the purpose of the agreement and constituted a material breach because the very heart of the agreement revolved around the continued operation of the automotive repair shops.

### A.  Prospective Damages Under the FTA

Meineke asserts that it is entitled to loss of prospective fees as a result of Defendants' material breach. Meineke's relationship with its franchisees is governed by the FTA, along with the "introduction, personal guarantees, Schedules and addenda (if any) to [the Franchise] Agreement, as well as the Operations Manual . . . and constitute the entire agreement of the parties." (<u>See</u> Exs. 1, 5, 8, and 13 at Article 17.11). Articles 3.2 and 3.4 of the FTAs set out fees Defendants are obligated to pay, which consist of "royalty fees" and "Contributions to Meineke Advertising Fund." (Exs. 1, 5, 8, and 13 at Articles 3.2 and 3.4). The amounts due pursuant to the royalty provisions are calculated based on a percentage of Defendants' sales, and the Advertising Fund is based on eight percent of the franchisee's gross revenues plus royalties consisting of the aggregate of different percentages of sales for different products (for example, 7% of wiper blade sales, 3% of oil change revenue).

Although the FTAs establish that Defendants were required to make payments under the contract, the FTAs make no provision for Meineke to recover amounts from Defendants subsequent to the termination of the FTAs. Instead, Article 15.1, titled "Effect of Termination or Expiration: Payments of Amounts Owed to Us" of each contract asserts:

> You agree to pay us and our Affiliates immediately upon termination or expiration (without grant of a successor franchise) of this Agreement, all royalties, MAF payments, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

(Exs. 1, 5, 8, and 13).  This provision is not prospective in nature and does not require Defendants to pay royalties or advertising fund fees due in the future.  See L.A.D. 1603, 2008 U.S. Dist. LEXIS 33566 at *3 (examining Article 15.1 and finding "[t]hat provision is clearly not prospective in nature. It does not contemplate the Defendants being obligated for any 'future' royalties or fees.").  The FTAs state, "All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire." (Exs. 1, 5, 8, and 13 at Article 15.5).  The provisions requiring the payment of royalties and Advertising Fund fees do not expressly or by their nature survive the termination of the FTA.  L.A.D. 1603, 2008 U.S. Dist. LEXIS 33566 at *3 ("The provisions requiring the payment of royalties and Advertising Fund fees do not 'expressly or by their nature survive.'  Any obligation for such royalties and fees ended with the termination of the franchise agreement.").  By the express terms of the FTAs, Meineke's contract with Defendants does not permit the recovery of prospective damages.

Meineke's termination of the FTAs in the instant case terminated the Defendants' ability to generate royalties and fees, irrespective of whether Defendants had breached before Meineke terminated.  Meineke had the sole right to terminate under the FTA.[4]  Once it did, the contract

---

[4]FTA states:
> In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if: . . . (j) you fail to have your Shop open for business for any 6 consecutive days after you open your Shop (other than in connection with a relocation pursuant to Section

provided no right to future damages. Since franchisee's contributions were based on their revenues, the termination of the franchise agreement cut off the Defendants' ability to generate revenues. Thus, there were no revenues to generate liability for royalty fees or advertising fund fees. See L.A.D. 1603, 2008 U.S. Dist. LEXIS 33566 at *3 ("When Plaintiff terminated the franchise agreement, Plaintiff terminated the Defendants' ability to generate any revenues from the sale of Meineke products which would, in turn, generate any liability for 'royalty fees' under Article 3.2 or Advertising Fund fees under Article 3.4. Any percentage of zero is zero.").[5] The Court grants Defendants' motion for summary judgment on Plaintiff's prospective damages claim.

### B. Lost Profits

Even though Meineke is not entitled to future royalties or fees pursuant to the terms of the FTAs, it asserts that it is still entitled to lost profits as damages because Defendants breached the contract. Lost profits are only recoverable under limited circumstances: "when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of the contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may be reasonably supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of the breach." Keith v. Day, 343 S.E.2d 562, 568-69 (N.C. Ct. App. 1986) (internal quotation marks omitted). Meineke asserts that it is entitled to three years lost profits as damages.

---

2.6 or due to force majeure); . . . .
(Ex. 1, Article 13.1).

[5]When brought to its attention by Defendants, Meineke distinguished L.A.D. 603 and Duvall on the basis that in those cases, Meineke terminated the FTAs for failure to make required payments, whereas here, Defendants prematurely closed their Shops and "abandoned" the location. Abandonment is irrelevant to prospective damages. Notwithstanding the different factual predicates, the cases are apposite in that all involved Meineke's decision to terminate without contractual provisions for prospective damage recovery.

## 1.    It is Not Reasonably Certain that Lost Profits Would Have Been Realized but for the Breach

To recover lost profits, plaintiffs must prove that "it is reasonably certain that such profits would have been realized except for the breach of contract." Perkins v. Langdon, 74 S.E.2d 634, 644 (N.C. 1953).  In this case, it is not reasonably certain that profits would have been realized but for the breach.  Shop No. 1661's net income was never profitable between 2005 and 2008.  Shop No. 1889 was profitable during its first operational year; however, the Shop had a negative net income the subsequent year.  Shop No. 1889 then had a marginally profitable third year, only to have a negative net income for the remaining two years, after the Shop had ceased operations. Shop No. 1660 was profitable during its first operational year but was not profitable during its second calendar year.  Although Defendants ceased operations during the second year, Meineke has not proven that Shop No. 1660 would have continued to generate income, but for the breach.  Shop No. 1660's first profitable year could be attributed to initial success, similar to Shop No. 1889's initial success, and Meineke has not met its burden of proof to demonstrate that Shop No. 1660 would have continued to generate income.  Similarly, Shop No. 1886 was never profitable.  RLB sold Shop No. 1886 to AEB which did not prove to be profitable, and AEB's landlord subsequently evicted them.  During 2005 and 2006, Shop No. 1886 had a negative net income.

Although Meineke has set forth a formula for computing such lost profits, it has not met its burden of proof that Defendants' business would have been profitable.  Defendants' Shops struggled to keep business going, and Meineke has not proven that such profits would have been realized, but for the breach.  Meineke argues that every year Defendants operated the four Shops, the Shops generated revenue.  However, as detailed above, Meineke's assertion is inaccurate.  Even though

12

Shop No. 1660 may have generated some revenue during operations, Meineke's lost profits damages claim fails because Meineke carries the burden to prove that these profits would have been realized in each of the four Shops, and Meineke has not met this burden. See Duvall, 2007 U.S. Dist. LEXIS 27120 at *3 (concluding that Meineke's failure to provide proof that franchisee would have continued to generate income but for the breach cut off recovery of prospective profits).

### 2.      Such Profits Cannot be Determined with Reasonable Certainty

In order to be recovered, lost profits must be determined with reasonable certainty. Day, 343 S.E.2d at 568-69. Meineke used a generic calculation for lost profits based on the CFO's claim that it usually takes three years to re-franchise a location. This calculation does not assess the store's specific location, viability, or profitability. "[W]hen prospective profits are conjectural, remote, or speculative, they are not recoverable." Mosley & Mosley Builders, Inc. v. Landin Ltd., 361 S.E.2d 608, 613 (N.C. Ct. App. 1987) (internal quotation marks omitted). Meineke's assertion that it takes three years to re-franchise a store is speculative and lacks precision. Meineke cannot say with certainty that every franchise takes three years. See L.A.D. 1603, 2008 U.S. Dist. LEXIS 33566 at *5 ("Meineke's claim that it usually takes it three years to re-franchise a business is speculative."). It is possible that the specific franchise may only require one year or two years to re-franchise or may never re-franchise in that location. Additionally, the FTA does not contain a provision for the recovery of lost profits or royalties, and it does not contain a provision relating to a three year period. Id. ("In addition to the fact that the franchise agreement does not contain a provision for the recovery of lost profits or royalties, it also does not contain a provision relating to a three year period."). Meineke's lost profits claim cannot be measured and ascertained with reasonable certainty.

### 3. Lost Profits were not Reasonably Within the Contemplation of the Parties

Future damages were not reasonably within the contemplation of the parties at the time of the contracts were entered into. If they had been, Meineke would have contractually provided for them. Meineke argues that failing to award lost profits results in the franchisee receiving its bargained-for benefits, yet leaving Meineke without any benefits from the agreement. Meineke asserts that this ruling converts the contract into something different, a terminable at will contract by Defendants that provides no recourse for Meineke. This is not true. Meineke still may seek recovery of amounts then owing as provided for in the contract. Meineke simply failed to provide for prospective damages.[6] Meineke's FTAs expressly assert, "The language of this Agreement will be construed according to its fair meaning and not strictly against or for any party." (Exs. 1, 5, 8, and 13 at Article 17.11). It would be unjust to construe the FTAs as permitting future damages when the words don't provide for them.

### C. Failure to Mitigate

Meineke seeks damages for three years of prospective losses even though it might re-franchise the business within a shorter time period. Meineke admits that it typically does not try to re-franchise a shop once it has closed, and there is no evidence that Meineke attempted to mitigate its damages under the FTAs by re-franchising. A plaintiff's failure to mitigate its damages operates as a bar to recovery. Miller v. Miller, 160 S.E.2d 65, 73-74 (N.C. 1968) ("The rule in North Carolina is that an injured plaintiff, whether his case be tort or contract, must exercise reasonable care and

---

[6]Additionally, Meineke's contract in the instant case has identical royalty and termination provisions to Meineke's FTA in L.A.D. 1603 and Duvall, which shows that Meineke has a strong bargaining power by its ability to enforce boiler-plate provisions on its franchisees. See L.A.D. 1603, 2008 U.S. Dist. LEXIS 33566; Duvall, 2007 U.S. Dist. LEXIS 27120.

diligence to avoid or lessen the consequences of defendant's wrong. If he fails to do so, for any part of the loss incident to such failure, no recovery can be had."). Meineke did not attempt to re-franchise Shop Nos. 1660, 1661, 1886, or 1889, but rather projected that it typically takes three years to re-franchise a location. Meineke's CFO testified in his deposition that "we typically do not try to refranchise a specific territory." (Doc. No. 25-4 at 2). Therefore, in addition to the previously discussed reasons why Meineke's loss profits claim fails, Meineke's claim also fails because Meineke did not attempt to mitigate its losses.

### D. Conclusion

In conclusion, the Court finds there is no genuine issue of material fact in dispute. Taking the facts in the light most favorable to Meineke, the Court finds that Meineke cannot maintain a claim for loss of prospective fees and lost profits. Thus, Defendants' motion for summary judgment against Plaintiff's loss of prospective damages and lost profits claims is granted and Meineke's motion for summary judgment for future damages is denied.

## IV. CLAIM FOR UNPAID ROYALTIES, ADVERTISING CONTRIBUTIONS, AND MERCHANDISE ACCOUNT DEBT AT THE TIME OF TERMINATIONS

Meineke asserts that it is entitled to recover past due royalties, advertising contributions, and merchandise account debt totaling $12,142.21 for Shop Nos. 1660, 1661, and 1889. (See Ex. 23: Carlet Aff., ¶¶11-12). Meineke also asserts that Defendants owe unpaid franchise royalties and advertising contributions as guarantor of AEB's performance under Shop No. 1886, totaling $9,601.26. (Id. at ¶11). In total, Meineke seeks summary judgment in its favor on its claims against Defendants for the four Shops' past dues, totaling $21,743.47.

The parties had a valid contract and Defendants breached the contract by prematurely closing

the Shops. In this situation, the FTAs provides that they "constitute the entire agreement of the parties." (Exs. 1, 5, 8, and 13 at Article 17.11). Under the FTAs, Defendants and AEB agreed to pay Meineke a weekly royalty of 7%, 5%, 4%, or 3% of the Shops' gross revenues, depending on the type of service performed. (Exs. 1, 5, 7, 8, and 13 at Article 3.2). In addition to the franchise royalties, franchisees pay Meineke a weekly advertising contribution, which is used towards paying Meineke's advertising and marketing costs. (Id. at Article 8.2). Defendants agreed under the FTA to pay an advertising contribution equaling 8% of the Shops' gross revenues. (Id.). These two calculations form the basis for Meineke's damages claim.

The FTAs provide Meineke the sole power to terminate if the franchisee fails to open for business for any six consecutive days after the Shop has been in business, other than in connection with a relocation or due to force majeure. (See Franchise Agreement at Article 15.1). It is undisputed that Defendants and AEB failed to open the Shops for six consecutive days, thereby allowing Meineke the option to terminate the FTAs. Upon termination, the relevant portions of the FTAs are the same for all four Shops:

> You agree to pay us and our Affiliates immediately upon termination or expiration (without grant of a successor franchise) of this Agreement, all royalties, MAF payments, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

(Exs. 1, 5, 8, and 13 at Article 15.1). The FTAs expressly establish that upon termination, all outstanding royalties and advertising funds must be paid immediately.

The effective termination dates are as follows: Shop No. 1660–January 16, 2006 (See Ex. 15); Shop No. 1661–December 10, 2006 (See Ex. 19); Shop No. 1889–August 1, 2007 (See Ex. 22); and Shop No. 1886– September 24, 2006 (See Ex. 20). Defendants failed to submit evidence that

refutes or discounts Meineke's calculation of the amounts owed. Thus, the Court finds that Defendants are liable for outstanding royalties and advertising funds for Shop Nos. 1660, 1661, and 1889 in the amount of $12,142.21. The only remaining issue is whether Defendants are liable for past damages for Shop No. 1886, or whether Mr. Bajjani's Limited Guaranty was no longer effective.

Defendants' Sales Contract with AEB for Shop No. 1886 was completed on February 1, 2006. (Ex. 10). Mr. Bajjani signed a Limited Guaranty Agreement, agreeing to guaranty AEB's performance and obligations under the 1886 AEB Franchise Agreement. Mr. Bajjani's Guaranty ended at the earlier of either AEB completing the purchase of the assets of Shop No. 1886 or three years from Mr. Bajjani's execution of the Limited Guaranty. (Ex. 12). The Limited Guaranty Agreement states, "The term of the Guaranty shall be extended until Franchisee completes the purchase of the assets of Meineke shop #1886, such that it maintains title to all of the assets of this Meineke store." (Ex. 12). Meineke asserts that the Guaranty remained in effect because Defendants' Sales Contract with AEB did not cover the sale of all of the assets because Defendants had an ongoing Equipment Rental Contract with AEB. (Ex. 11). Defendants assert that the purchase of the assets of Meineke Shop No. 1886 was completed when AEB paid the $10 purchase price, and thus the Guaranty expired on February 1, 2006.

The parties use different dates to denote the time when the parties entered into the Guaranty. Defendants assert that Mr. Bajjani entered into the Guaranty some time around the same time as the Sales Contract–January 30, 2006. Meineke asserts that the parties executed the Guaranty on March 3, 2006, the date that the document was faxed. The Court finds that the document was in fact effective on April 20, 2006, the date when the Meineke license was executed between AEB and

Meineke. (See Ex. 12 at 2 ("IN WITNESS THEREOF, the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Assignment of Meineke License was executed."); Ex. 13 at 44). As the Guaranty became effective on April 20, 2006, it could not have referred to the earlier executed Sales Contract but rather had to mean the purchase of other assets such as equipment. Since AEB never purchased that equipment but rather rented it, the Guaranty was still in effect as of the date that AEB closed Shop 1886. Thus, Defendants owe unpaid franchise royalties and advertising contributions as guarantor of AEB's performance under Shop No. 1886, totaling $9,601.26.[7]

In conclusion, having found no genuine issue of material fact, Defendants are liable for past damages for Shop No. 1660, 1661, 1886, and 1889, and owe Meineke $21,743.47.

## V. DEFENDANTS' COUNTERCLAIMS AGAINST MEINEKE FOR BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALINGS

Defendants filed counterclaims against Meineke for breach of contract and breach of good faith and fair dealing. Meineke seeks summary judgment on Defendants' breach of contract and breach of good faith claims.

### A. Breach of Contract

In an action for breach of contract, plaintiff must show that a contract existed and the specific provisions breached. Harrington v. Perry, 406 S.E.2d 1, 2 (N.C. Ct. App. 1991). Defendants allege that Meineke "fail[ed] to perform its obligations in a proper and timely manner" and "fail[ed] to act in a manner consistent with the purpose of the agreements." (Doc. No. 3 at 15). Defendants have

---

[7]As the Defendants did not contest this figure, the Court adopts Meineke's CFO's estimation of amounts due. (Ex. 23 ¶ 11).

failed to point to any specific provision of the FTAs that Meineke has breached. These generalized grievances do not support a breach of contract claim.

Defendants' two other claims were more specific. Defendants first assert that Meineke "fail[ed] to use the marketing and advertising funds in the manner required by the franchise agreements and/or in the manner required to fulfill its commitment to enhance goodwill, strengthen the business and expand the Meineke chain." (Id.). The FTAs, however, expressly state, "We [Meineke] have sole discretion over all aspects of the materials and programs funded by MAF [Meineke Advertising Fund], including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and context . . . ." (Exs. 1, 5, 8, and 13 at Section 8.2). The FTAs further provide, "[W]e cannot assure you that any particular Meineke Shop, or that Meineke Shops in any particular local market area, will benefit directly or pro-rata from any marketing, advertising or related program." (Id.). Therefore, Defendants cannot successfully establish a breach of contract based on their discontent with Meineke's exercise of its business judgment over which it has sole discretion. See America's Favorite Chicken Co. v. Cajun Enter., Inc., 130 F.3d 180, 182 (5th Cir. 1997) (affirming dismissal of breach of contract claim where franchisee's claims related to franchisor's exercise of its complete discretion pursuant to the terms of the franchise agreement).

Defendants also assert that Meineke "fail[ed] to provide local or regional representatives to support its franchisees . . . ." (Id.). This claim also fails to adequately address a specific breached provision of the FTAs because the FTAs merely require that Meineke "maintain an adequately staffed advertising department to perform the services we [Meineke] customarily provide in administering the advertising and other programs funded by the MAF." (Exs. 1, 5, 8, and 13 at Section 8.2). Meineke has the sole discretion to make such a determination regarding staffing needs,

19

and therefore, Meineke has not breached an express provision of the FTAs.  For the foregoing reasons, Defendants' breach of contract claim fails.

Having found no genuine issue of material fact in dispute, Plaintiff's motion for summary judgment on Defendants' counterclaim for breach of contract is granted.

**B.      Breach of Good Faith and Fair Dealings**

Defendants claim that Meineke breached the duty of good faith and fair dealing.  Plaintiff moved for summary judgment on Defendants' claim that Meineke breached the duty of good faith and fair dealing, asserting that this claim cannot be independent from Defendants' breach of contract claim.

The North Carolina Supreme Court "has recognized 'that in every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 368 (N.C. Ct. App. 1996) (quoting Bicycle Transit Auth., Inc. v. Bell, 333 S.E.2d 299, 305 (N.C. 1985)).  North Carolina courts, however, do not consider breach of good faith claims independently from breach of contract claims unless there is a special relationship between the parties. Mechanical Indus., Inc. v. O'Brien/Atkins Assocs., 1998 U.S. Dist. LEXIS 5389, *10 (M.D.N.C. 1998) ("North Carolina recognizes an action for breach of an implied duty of good faith and fair dealing in limited circumstances involving special relationships between parties, e.g., cases involving contracts for funeral services and insurance.  Outside such circumstances, actions for breach of good faith fail."); B. Lewis Prods., Inc. v. Angelou, 2005 U.S. Dist. LEXIS 9032, *36 (S.D.N.Y. 2005) (noting that the "weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a

breach of contract claim should not be pursued separately"). Defendants and Meineke do not have the requisite special relationship required under North Carolina law to justify a separate cause of action for breach of the implied covenant of good faith and fair dealings. Thus, these claims are combined under North Carolina law.[8] Therefore, for the reasons stated previously, Defendants' breach of good faith and fair dealings claim fails along with their breach of contract claim.

Having found no genuine issue of material fact in dispute, Plaintiff's motion for summary judgment on Defendants' claim for breach of good faith and fair dealing is granted.

## VI. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. The Court **GRANTS** Defendants' motion for summary judgment on Meineke's loss of prospective fees and lost profits claims.

2. The Court **DENIES** Meineke's motion for summary judgment regarding future damages.

3. The Court **GRANTS** Meineke's motion for summary judgment regarding past amounts due. Defendants owe Meineke $21,743.47.

4. The Court **GRANTS** Meineke's motion for summary judgment on Defendants' counterclaims for breach of contract and breach of the duty of good faith and fair dealing.

---

[8] Defendants' only allegation that differs from its breach of contract claim is that Meineke breached its duty of good faith "[b]y undermining the efforts of Defendants to abide by local laws and ordinances." (Doc. No. 3 at 16). Defendants assert that Meineke violated the duty of good faith and fair dealing by insisting that Defendants abide by the FTA's signage requirements, which conflicted with the local sign ordinances. A party cannot rely on the implied duty of good faith and fair dealing to expand or otherwise contradict the express terms of a contract by claiming that some additional obligations existed. Rich Food Servs., Inc. v. Rich Plan Corp., 98 Fed. App'x 206, 211 (4th Cir. 2004). Therefore, Defendants' claim fails because it suggests that Meineke was obligated to change the terms of the FTA for Defendants; thereby creating an additional duty on Meineke and directly contradicting the FTA.

**IT IS SO ORDERED.**

Signed: August 7, 2009

Robert J. Conrad, Jr.
Chief United States District Judge