**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 09-2030**

---

MEINEKE CAR CARE CENTERS, INCORPORATED,

                Plaintiff - Appellant,

      v.

RLB HOLDINGS, LLC; JOE H. BAJJANI; MICHELLE G. BAJJANI,
a/k/a Michelle Bajjani,

                Defendants - Appellees.

---

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., Chief District Judge.  (3:08-cv-00240-RJC-DSC)

---

Argued:  January 27, 2011           Decided:  April 14, 2011

---

Before GREGORY and AGEE, Circuit Judges, and Irene C. BERGER, United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Reversed and remanded by unpublished opinion.  Judge Agee wrote the opinion, in which Judge Gregory and Judge Berger concurred.

---

**ARGUED:** Michael J. Lockerby, FOLEY & LARDNER, LLP, Washington, D.C., for Appellant.  Rodney Lenelle Eason, THE EASON LAW FIRM, Atlanta, Georgia, for Appellees.  **ON BRIEF:** Amy K. Reynolds, Ted P. Pearce, MEINEKE CAR CARE CENTERS, INC., Charlotte, North Carolina, for Appellant.  Leslie K. Eason, THE EASON LAW FIRM, Atlanta, Georgia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Franchisor Meineke Car Care Centers, Inc. ("Meineke") appeals the district court's judgment awarding franchisee RLB Holdings, LLC ("RLB"), Joe H. Bajjani, and Michelle G. Bajjani partial summary judgment on Meineke's claim for lost future royalties and advertising fund contributions following the premature closure of four franchises. The district court held that the franchise agreements did not entitle Meineke to recover future damages, and that Meineke failed to set forth a viable common law claim for lost profits. For the reasons set forth below, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

I.

Meineke is a nationwide automotive services franchisor. Joe Bajjani and his wife, Michelle, ("the Bajjanis") are the sole owners of RLB, an entity formed for the purpose of operating Meineke franchises, including the four stores at issue in this case. Between December 2001 and June 2005, Meineke and RLB entered into four separate Franchise and Trademark Agreements ("FTAs") related to four franchises (collectively "the Shops") that RLB would operate using Meineke's registered trademark, logo, and other proprietary marks. The Bajjanis

3

executed personal guaranties as part of each shop's FTA, guaranteeing RLB's performance and obligations under each FTA.[1] [2]

Although the terms of the FTAs are not identical, they are substantially the same, primarily using Meineke's boilerplate franchise agreement language. The FTAs each had a fifteen-year term and granted RLB the exclusive right to operate a Meineke shop within a protected territorial area. RLB agreed under the FTAs to pay Meineke weekly royalty fees ("royalties") based on a percentage of each shop's gross revenues, with the rate varying from three to seven percent depending on the product or service. (Article 3.2 – J.A. 35.) Subject to certain conditions, RLB was also required to "contribute 8% of [its] Gross Revenues to the Meineke Advertising Fund" ("advertising fund contributions"),

---

[1] The Bajjanis subsequently sold one of the Shops, Number 1886, to another corporation, following the FTA's protocol for doing so. Joe Bajjani executed a limited guaranty agreement, guaranteeing the corporation's performance and obligations under the FTA. The district court held Bajjani liable for past damages related to Shop No. 1886 because they were incurred during the time the personal guaranty was in effect. Bajjani does not dispute that holding, and it is not before us on appeal. Despite this transfer of ownership, and unless otherwise noted, we will not differentiate between the Shops for purposes of assessing the parties' arguments regarding the issue that is before us on appeal. On remand, the district court can ascertain what, if any, effect Bajjani's personal guaranty has on Meineke's claim for future damages arising from the closure of Shop 1886.

[2] Throughout the rest of the opinion, we will refer to the defendants collectively as "RLB," distinguishing between them only where necessary to the discussion.

4

such sum also being payable weekly.[3]    (Article 3.4 – J.A. 36.)
In exchange for its obligations to Meineke, RLB was entitled,
inter alia, to operate under the "Meineke" name and use the
associated logo and other marks, and also to receive training
and access to Meineke's methods, procedures, and techniques.

Meineke had the right to terminate each FTA under certain
circumstances, but RLB did not have a reciprocal right to
terminate.    One such circumstance permitting Meineke to
terminate the FTAs was if RLB "fail[ed] to have [its] Shop open
for business for any 6 consecutive days after [it] open[ed]
[its] Shop (other than in connection with a relocation . . . or
due to force majeure)."  (Article 13 – J.A. 66.)

---

[3] The FTAs defined "gross revenues" as
all the revenues derived from or in connection with
the operation of [the] Shop, whether from sales for
cash or credit, and irrespective of their collection,
including charges for Authorized Products and Services
and applicable proceeds from any business interruption
insurance for your Shop, but excluding: (a) sales
taxes, use taxes, gross receipts taxes, and other
similar taxes added to the sale price, collected from
the customer and remitted to the appropriate tax
authorities; (b) credit card fees on credit card
sales; and (c) check guaranty fees.  "Gross Revenues"
also include revenues derived from any products or
services sold and/or performed from or in connection
with your Shop that are not Authorized Products and
Services . . . .
(Article 3.3 – J.A. 36.)

5

RLB closed each of the shops well before the end of the respective FTA's 15-year period.[4] Upon learning of the closures, Meineke sent RLB letters notifying it that the decision to close the Shops prematurely "would be deemed an abandonment and a breach of contract." (J.A. 352.) With respect to at least one of the shops, Meineke specifically informed RLB that "[t]o avoid being in breach of contract," RLB had "three options: 1) continue operating [the shop]; 2) sell the shop to a buyer pre-approved by Meineke who will continue to operate the shop as [a Meineke franchise]; or 3) relocate the shop to another location approved by Meineke." (J.A. 352.) Meineke asked RLB to communicate its intent with respect to each of the closed shops.[5] RLB did not reopen any of the shops. Meineke subsequently sent RLB letters by which Meineke exercised its right to terminate each FTA, with the date of termination effective as of the date each shop closed.

---

[4] Shop Number 1660 closed "[o]n or about January 16, 2006"; Shop Number 1661 closed "[o]n or about December 10, 2006"; Shop Number 1886 closed "[o]n or about September 24, 2006; and Shop Number 1889 closed "on August 1, 2007." (J.A. 353, 393, 402, 406.) The Shops had between eleven and fourteen years remaining on their terms.

[5] For some period of time, RLB appeared to desire relocating Shop 1661 and informed Meineke of its intent to do so, but eleven months after closing the Shop at its original location, it still had not opened the Shop at a new location. At that point, Meineke informed RLB it was terminating the FTA for that Shop.

There is no evidence in the record that RLB ever responded to Meineke's interim letters regarding the other three Shops.

6

Meineke filed a complaint in North Carolina state court alleging RLB breached the FTAs causing Meineke to, inter alia, "lose the contractually agreed to royalties and advertising [fund] contributions that it would have received during the remaining term[s]" of each FTA. (J.A. 21.) RLB removed the case to the Western District of North Carolina on the basis of diversity jurisdiction. It also filed counterclaims of breach of contract and breach of the duty of good faith and fair dealing.

The parties then filed cross motions for summary judgment. RLB sought partial summary judgment on Meineke's future damages claims, while Meineke sought summary judgment on all of its claims and the counterclaims.

The district court granted RLB partial summary judgment as to Meineke's claim for future damages for any prospective royalties and advertising fund contributions for periods after termination of the FTAs. Meineke was granted summary judgment on claims for past amounts due for periods prior to termination of the FTAs and the counterclaims by RLB.

Meineke noted a timely appeal of the portion of the district court's judgment related to its claim for future damages. Because RLB did not cross-appeal the judgment against it, that portion of the district court's order is not before us. Our sole inquiry concerns the district court's award of summary

judgment based on its determination that Meineke failed as a matter of law to show it was entitled to future damages in the form of lost future royalties and advertising fund contributions.  We have jurisdiction under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment de novo.  Hawkspere Shipping Co. v. Intamex, S.A., 330 F.3d 225, 232 (4th Cir. 2003).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and a party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, we are to "view all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party," that being Meineke in this case.  Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 603 (4th Cir. 2002).

## III.

The district court's decision relied on two primary grounds.  First, the court determined that Meineke was not entitled to recover prospective damages under the FTAs.  Second, the court determined that Meineke was not entitled to recover lost profits under North Carolina law.  We review each part of the holding in turn.

8

At the outset we note that before reaching the prospective damages claim, the district court determined that the decision by RLB to prematurely close the Shops "constituted a material breach" of the FTAs "because the very heart of the agreement revolved around the continued operation of the automotive repair [S]hops." (J.A. 829.) RLB does not contest this ruling. It is therefore the law of the case and we are bound by it on appeal. See Mironescu v. Costner, 480 F.3d 664, 677 n.15 (4th Cir. 2007); see also Fed. R. App. Pro. 28(b). Accordingly, for purposes of our analysis, RLB materially breached the FTAs by permanently closing the Shops prior to the end of their respective fifteen-year terms.

### A.

The first part of the district court's analysis examined whether Meineke was entitled to future damages "under the FTAs." The district court held that "[b]y the express terms of the FTAs, Meineke's contract with [RLB] does not permit the recovery of prospective damages." (J.A. 830.) The district court based this conclusion on several factors: the absence of any express "provision for Meineke to recover amounts from [RLB] subsequent to the termination of the FTAs," J.A. 829, the absence of any provision stating that the duty of paying royalties and advertising fund contributions survives termination of the FTAs,

9

the fact Article 15.1 only requires RLB to pay past due royalties and advertising fund contributions upon termination, and the fact that payment of royalties and advertising fund contributions do not expressly or by their nature survive termination of the FTA and therefore do not fall within the survivorship provision in Article 15.5.  Read as a whole, but without explicitly stating so, the district court's order seems to imply that Meineke could not recover prospective damages unless a specific FTA contractual provision permitted such damages.  (See J.A. 830.)

Meineke contends the district court erred because North Carolina law does not require that the written contract (the FTAs) provide for future damages in order to recover these damages in the event of a breach.  It also maintains the district court misconstrued provisions of the FTA (Article 15.1 and 15.5) to preclude recovery of prospective damages when those provisions addressed other issues and do "not purport to address all remedies available to Meineke for a franchisee's breach." (Appellant's Opening Br. 20.)

"Under North Carolina law, a court's primary purpose in construing a contract is to ascertain the intent of the parties at the time of the contract's execution." S.C. Nat'l Bank v. Atl. States Bankcard Ass'n, 896 F.2d 1421, 1426 (4th Cir. 1990) (citation omitted).  "Where the terms of the contract are not

ambiguous, the express language of the contract controls in determining its meaning . . . ." Id. (quotation and citation omitted).

The district court is correct that the FTAs do not specifically provide for recovery of future damages in the event of a breach of contract. However, nothing in the FTAs precludes such damages either.[6] No principle of North Carolina contract law suggests that in all circumstances a contract must specifically provide for recovery of future damages in order to preserve a party's right to recover them. To the contrary, cases discussing recovery of lost profits do not refer to the

---

[6] Meineke points to Article 17.10 as further proof that the district court erred, observing that contract provision preserves "any other right or remedy which [a] party is entitled to enforce by law." (Appellant's Opening Br. 21, quoting Article 17.10 at J.A. 75.) RLB argues that Meineke's failure to raise the applicability of Article 17.10 in the district court precludes it from being able to rely on it on appeal. (Appellees' Br. 36.) Meineke does not dispute its failure to raise the application of Article 17.10 below, and defends its reliance on the provision by stating that appellate review of a district court's interpretation of a contract is de novo.

While Meineke articulates the proper standard of review, Williams v. Prof'l Transp. Inc., 294 F.3d 607, 613 (4th Cir. 2002), the standard of review is wholly separate from whether a party has adequately preserved an issue for review on appeal. Consistent with our general rule on this point, we have held that "the failure of a party at trial to raise a certain interpretation of a[] contract results in a waiver of that argument on appeal absent exceptional circumstances." In re: Wallace & Gale Co., 385 F.3d 820, 835 (4th Cir. 2004); Canada Life Assurance Co. v. Estate of Lebowitz, 185 F.3d 231, 239 (4th Cir. 1999). Finding no exceptional circumstances in this case, we will not consider Meineke's argument and consider it waived as to Article 17.10.

11

parties' contracts as the basis for the non-breaching party's right to such a recovery. See, e.g., Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 234 S.E.2d 605, 607 (N.C. 1977); Perfecting Serv. Co. v. Prod. Dev. & Sales Co., 131 S.E.2d 9, 21-22 (N.C. 1963); Builders' Supply & Equip. Corp. v. Gadd, 111 S.E. 771, 772 (N.C. 1922); Storey v. Stokes, 100 S.E. 689, 690-92 (N.C. 1919); Pender Lumber Co. v. Wilmington Iron Works, 41 S.E. 797, 798 (N.C. 1902). While the parties were certainly free to contract for liquidated damages or to bar a right to recover lost profits under North Carolina law, they did not do so in this case. To the extent the district court's decision required the FTAs to specifically provide for prospective damages as a mandatory condition precedent to preserve a non-breaching party's right to recover such damages, this was error.

Contrary to the district court's conclusion, Articles 15.1 and 15.5 of the FTAs do not operate as bars to recovering future damages. Article 15.1 states that upon termination or expiration of the FTAs, RLB "agree[s] to pay [Meineke] all royalties, [advertising fund] payments, amounts owed for purchases . . . , interest due on any of the foregoing and all other amounts owed to [Meineke] which are then unpaid." (J.A. 68.) Article 15.1 only addresses what is owed up to termination of the FTAs. It is silent about RLB's liability for periods after termination. By expressly providing for certain

12

obligations upon termination or expiration of the FTAs, Meineke and RLB did not implicitly exclude other legal rights that may accrue in addition to those stated.   The district court's construction in this instance runs contrary to the instruction that courts "will not resort to construction [of a contract] where the intent of the parties is expressed in clear and unambiguous language."  Wallace v. Bellamy, 155 S.E. 856, 859 (N.C. 1930).   There is no need to construe the Article 15.1 language to mean something other than the circumstances to which it clearly applies—pre-breach damages.   The provision is silent as to prospective damages arising after termination pursuant to breach of the FTA.   The district court erred in reading Article 15.1 as precluding future damages.

The district court's construction of Article 15.5 is similarly mistaken.   Article 15.5 states:   "All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire."   (J.A. 70.)   Although the right to royalties and advertising fund contributions do not expressly survive the expiration or termination of the Agreement as a provision of the contract, they need not do so in order to form the basis of a prospective damages claim in the event Meineke is otherwise entitled to those damages under other applicable law.

13

As discussed below, Meineke's right to recover such sums as the measure of damages resulting from a breach of the FTAs arises under North Carolina law and is independent and separate from any obligation to pay such sums as a new obligation arising under the FTAs.[7]

In sum, the FTAs neither specifically provided for nor expressly prohibited Meineke from recovering prospective damages in the event of RLB's material breach.   In the absence of an express contractual provision barring future damages, the FTAs did not prohibit the recovery of those damages if otherwise permitted under North Carolina law.   The district court erred in holding otherwise.

B.

Meineke's ability to recover future damages thus depends on whether it adduced sufficient evidence to set forth a North Carolina common law claim for lost profits.   Under North Carolina law,

> the general rule is that a party who is injured by
> breach of contract is entitled to compensation for the

---

[7]   While the parties could have agreed to bar a future damages claim in the written FTA, they did not do so.   But whether a future damages claim was otherwise within their contemplation under state law at the formation of their contract is an unresolved and disputed factual issue, as more fully discussed below.

14

> injury sustained and is entitled to be placed, as near as this can be done in money, in the same position he would have occupied if the contract had been performed. Stated generally, the measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed as made, which means the value of the contract, including the profits and advantages which are its direct results and fruits.

Perkins v. Langdon, 74 S.E.2d 634, 643 (N.C. 1953) (citations omitted). Accordingly, "[d]amages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach." Mosley & Mosley Builders, Inc. v. Landin Ltd., 361 S.E.2d 608, 613 (N.C. Ct. App. 1987) (citing Perkins, 74 S.E.2d at 634.). North Carolina courts have set out a three-part test for determining when a party may recover lost profits

> "when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may reasonably be supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of the breach."

Keith v. Day, 343 S.E.2d 562, 568 (N.C. Ct. App. 1986) (quoting Perkins, 74 S.E.2d at 644). In addition, the non-breaching party has a duty to mitigate its damages by "exercis[ing] reasonable care and diligence to avoid or lessen the consequences of [the] wrong." See Miller v. Miller, 160 S.E.2d 65, 74 (N.C. 1968).

15

Based on these principles, in order to survive summary judgment, Meineke had the burden of showing sufficient evidence to establish or create a question of fact regarding these issues: (1) RLB's material breach proximately caused the potential for future damages in the form of lost future royalties and advertising fund contributions; (2) there is reasonable certainty that Meineke's lost profits would have been realized but for RLB's closure of the Shops; (3) the amount of Meineke's lost profits can be ascertained and measured with reasonable certainty; (4) at the time of entering into the FTAs, lost profits may reasonably be supposed to have been within Meineke and RLB's contemplation as the probable result of RLB's premature closure of the Shops. The district court held Meineke failed to establish any material facts in dispute as to each part of this analysis and that RLB was entitled to judgment as a matter of law. For the reasons set forth below, we disagree.

1.

The district court held that Meineke failed to show that RLB's breach proximately caused its prospective damages. In the district court's view, "Meineke's termination of the FTAs in the instant case terminated [RLB's] ability to generate royalties and [advertising] fees, irrespective of whether [RLB] had breached before" the termination. "Once [Meineke terminated the

16

FTAs, the FTAs] provided no right to future damages. Since [these sums] were based on [the Shops'] revenues, the termination of the [FTAs] cut off [RLB's] ability to generate revenues." (J.A. 830-31.)

The district court cited no legal authority directly supporting its conclusion. On appeal, the parties cite to numerous cases from courts across the country, none of which are binding on this court. We, too, found no controlling authority on point. Most of the relevant discourse appears in various federal district and state court opinions.

These courts have taken a variety of approaches to analyze whether a franchisor is entitled to recover lost profits. They have reached opposite conclusions based on the nature of the franchisee's breach and concerns such as whether recovering lost profits would result in the franchisor unfairly benefiting with a double recovery. See Moran Indus., Inc. v. Mr. Transmission of Chattanooga, Inc., 725 F. Supp. 2d 712, 720-23 (E.D. Tenn. 2010) (collecting and discussing cases examining whether a franchisor can ever be entitled to recover lost profits after terminating a franchise agreement in response to franchisee's breach of contract). We need not examine the full panoply of approaches because we believe the proper analysis is a

17

straightforward application of the relevant North Carolina law concerning damages recoverable following a breach of contract.[8]

Long-standing principles of North Carolina contract law permit a non-breaching party to recover damages that are "the

---

[8] Our approach is consistent with cases on both sides of the analysis, as the focal point has not been whether the franchisor or the franchisee is seeking lost profits, but whether the party breaching the contract proximately caused the lost profits being sought. Even where a court has held that the franchisor is not entitled to recover lost profits, the rationale for that decision has usually been that the franchisor's lawful termination of the parties' agreement was the proximate cause of lost profits rather the franchisee's breach, the most common example being a franchisee's breach for failing to pay past due royalties.

As the California Court of Appeals observed in _Postal Instant Press, Inc. v. Sealy_, 51 Cal. Rptr. 2d 365 (Cal. Ct. App. 1996), "it was the franchisor's own decision to terminate the franchise agreement that deprived it of its entitlement to . . . future royalty payments" because "[n]othing in the franchisee's [breach, i.e.,] failure to pay past royalties[,] in any sense prevented the franchisor from earning and receiving its future royalty payments." _Id._ at 370. But in so holding, the court emphasized that it was "not holding franchisors can never collect lost future royalties for franchisees' breaches of the franchise agreement. That entitlement depends on the nature of the breach and whether the breach itself prevents the franchisor from earning those future royalties." _Id._ at 371.

By contrast, in _Lady of America Franchise Corp. v. Arcese_, 2006 U.S. Dist. LEXIS 68415 (S.D. Fla. 2006), the United States District Court for the Southern District of Florida permitted a franchisor to recover lost future royalties where the franchisee voluntarily ceased operating the franchise, an action that, under the terms of their agreement, automatically terminated the agreement. _Id._ at *18. The court found "as a matter of law that [the franchisee's] actions were the proximate cause of the termination of the agreement and [the franchisor's] loss of future royalties." _Id._

We do not rely on any of these cases as specific authority, and only raise them as examples of how other courts have approached this issue.

18

proximate consequence of a breach of contract" and "all damages must flow directly and naturally from the wrong." <u>Johnson v. Atl. Coast Line R.R. Co.</u>, 113 S.E. 606, 608 (N.C. 1922) (citations omitted). Here, it is the law of the case that RLB materially breached the contract by closing the Shops before the FTAs' terms ended. The nature of this breach is so comprehensive as to constitute a de facto abandonment of the FTAs by the sole decision of the franchisee, RLB.[9] RLB's decision to close the Shops stopped the potential for generating any revenues through their future operation. That decision in turn meant that Meineke, by virtue of this independent action of RLB, would no longer receive royalties and advertising fund contributions that it was entitled to receive under the FTAs. RLB's breach was therefore the proximate cause of Meineke's lost profits.

Meineke's subsequent decision to terminate the FTAs had certain legal consequences impacting the relationship between the parties, but it did not cause RLB to stop operating the Shops and thereby stop generating revenues: an event which had

---

[9] The record indicates that Meineke sent RLB letters upon learning of the Shops' closure and provided RLB with an opportunity to respond as to its intent and cure the breaches in order to avoid termination of the FTAs. With the exception of the one shop RLB indicated it desired to relocate, there is no indication in the record that RLB responded to Meineke's interim letters. It was only after many months to over a year following each Shops' closure that Meineke finally terminated the FTAs.

19

already occurred.   As a result, Meineke was losing future royalties and advertising fund contributions it would have received had the stores remained opened.[10]   The district court thus erred in concluding that the termination of the FTAs by Meineke, rather than the established breach by RLB, proximately caused Meineke's lost profits.


2.

Closely linked to the causation analysis is the requirement that Meineke had to show that it was reasonably certain to realize lost profits absent RLB's breach.   The district court concluded that Meineke had not made the requisite showing because the "Shops struggled to keep business going." (J.A. 832.)   The court concluded Meineke did not provide sufficient evidence that the Shops "would have been profitable" had they remained open. (J.A. 832.)   Although the district court did not define "profits," its analysis focused on each shop's net income and whether the shop "generate[d] income." (J.A. 832.)

_____

[10]   In light of RLB's breach, termination seems to have been a prudent decision in order to prevent further losses and otherwise protect Meineke's interests.   As just one example, the decision to terminate the FTAs may appropriately be viewed as part of Meineke's responsibility to mitigate its damages following RLB's breach.   Under the terms of the FTAs, Meineke was prohibited from refranchising within a certain geographic proximity to the Shops as long as the FTAs were in force, and therefore could not have approved another party's application to franchise the area unless the FTAs were terminated.

As the non-breaching party, Meineke was "entitled to compensation for the injury sustained and [was] entitled to be placed, as near as this can be done in money, in the same position [it] would have occupied if the contract had been performed." Perkins, 74 S.E.2d at 643. As detailed above, the FTAs entitled Meineke to a percentage of the Shops' gross revenues each week, both as royalties and as advertising fund contributions. For purposes of avoiding RLB's motion for summary judgment, Meineke did not have to show that the Shops would generate a particular profit or have a particular net income, only that the Shops would have continued to have revenues. As long as the Shops continued to make some sales for any period of time after the breach, Meineke would be entitled to its lost royalties and advertising fund contributions as a percentage of those gross sales.

RLB contends "there is no evidence that [the Shops] could have continued to be operational . . . given their financial failings." (Appellees' Br. 43.) However, Meineke was not required to prove as part of its prima facie case for purposes of avoiding summary judgment that it was commercially feasible to operate the Shops at the time of the closures. Meineke was only required to show it was due future damages based on future operation of the Shops. RLB could put on evidence as to when the Shops could not operate in a commercially feasible manner,

forcing Meineke to adduce evidence to the contrary to avoid summary judgment. However, this record only reflects the Shops were not operating at a "profit" but without a definition of "profit." The record at this stage does not show the Shops could not operate in a commercially feasible manner for a particular period of time after RLB closed each shop, and the district court made no finding to that effect. The Shops, or some of them, may or may not have been able to operate at the time of their closures because operation was no longer commercially feasible. Whether a Shop made a profit is not relevant without a definition of "profit" and how that term relates to the commercial reasonableness of continued operation. At this point in the proceedings, that determination has not been made.[11]

There is a factual question then, both as to how long the Shops could have been kept operational and as to the amount of revenues the Shops would have generated during that period. It would be for the finder of fact to determine what lost profits

---

[11] For example, a franchisee may operate a location and fail to make a "profit" because it pays above-market compensation, uses revenues for other ventures, or a myriad of other purposes unrelated to that location. It would not be unusual for a franchise location to operate as "unprofitable" for a period of time until it establishes a market or stable management. None of these circumstances, standing alone, would excuse a franchisee from payment of royalties. What occurred in the case at bar is yet to be determined.

22

Meineke can prove it was reasonably certain to have realized from the time of the breach forward until such time as the finder of fact determines it was no longer reasonably certain that any revenues would exist.  We make no prediction what additional evidence, if adduced, may show or whether that be at another summary judgment proceeding or trial on the merits.  The salient point, for our purposes, is simply that material facts remain in dispute, which does not permit the award of summary judgment based on the current record.

Meineke satisfied its burden of showing with reasonable certainty that except for RLB's breach of the FTAs by closing the Shops, some revenue – and therefore some lost royalties and advertising fund contributions – would have been realized.  This showing was sufficient to survive summary judgment based on the current record, and the district court erred in holding otherwise.

3.

The district court also held Meineke's "generic calculation for lost profits" did not "assess [each shop's] specific location, viability, or profitability" and therefore failed to measure or ascertain the asserted lost profits with reasonable certainty.  (J.A. 833.)  The court specifically noted that Meineke's use of three years' lost profits based on the time it

23

usually takes to re-franchise a location was speculative because "Meineke cannot say with certainty that every franchise takes three years." (J.A. 833.)

Under North Carolina law, "[a]s part of its burden, the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." Olivetti Corp. v. Ames Bus. Sys., Inc., 356 S.E.2d 578, 586 (N.C. 1987) (citation omitted). Consequently,

> damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses. . . . Instead, [the court] evaluate[s] the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with "reasonable certainty."

Iron Steamer, Ltd. v. Trinity Restaurant, Inc., 431 S.E.2d 767, 770 (N.C. Ct. App. 1993). Absolute certainty is not required. Mosley, 361 S.E.2d at 613; see also McNamara v. Wilmington Mall Realty Corp., 466 S.E.2d 324, 329-31 (N.C. Ct. App. 1996).

Meineke asserts its lost profits were calculated with reasonable certainty. This is so, Meineke contends, because it used each shop's "actual historical sales data" to calculate what royalties and advertising fund contributions RLB would have paid Meineke in the future. (Appellant's Br. 44.) RLB responds that Meineke's calculations are speculative because Meineke uses "the identical generic formula [to calculate lost profits] in

24

every case" and "Meineke cannot say with certainty that every franchise takes three years." (Appellees' Br. 46.)

We begin with a brief summary of how Meineke calculated its future damages arising from the Shops' closures. For the three franchises still operated by the Bajjanis, Meineke calculated lost future royalties by using the average weekly sales of the shop in prior years, multiplying that average sum by the number of weeks in the three-year period for which it sought relief, and then multiplying that amount by an average historical royalty rate to determine the prospective franchise fees Meineke lost as a result of the breach. From that sum, Meineke deducted its incremental savings resulting from the premature closing of the franchise and then discounted that amount to present value. A similar calculation was used to determine lost future advertising fund contributions. For the fourth franchise (the one RLB sold to a third party), Meineke performed a similar calculation for both amounts, but took into account both royalty concessions and the period of time remaining on Joe Bajjani's personal guaranty.

Having reviewed the evidence Meineke set forth as to the amount of its lost profits, we conclude that the district court erred in holding Meineke's calculations were too remote and speculative to survive summary judgment. Just because Meineke uses the same formula in "every" breach of contract case does

not make its calculations speculative. Meineke used data specific to each shop to calculate the damages it sought from the closure of that shop. Meineke's calculations were based on a historical analysis of the Shops' actual revenues projected into the future, a methodology North Carolina courts have upheld as a reasonable basis for calculating damages like the future royalties and advertising fund contributions sought here: "If an established business is wrongfully interrupted, the damages can be proved by showing the profitability of the business for a reasonable time before the wrongful act. It is only when the prospective profits are conjectural, remote, or speculative, they are not recoverable." Mosley, 446 S.E.2d at 613 (internal quotation mark and citations omitted).[12]

---

[12] Indeed, using past profits as a basis for calculating future lost profits is a widely accepted methodology. Lockheed Info. Mgmt. Sys. Co. v. Maximus, Inc., 524 S.E.2d 420, 429 (Va. 2000) ("[E]vidence of the prior and subsequent earning record of a business can be used to estimate damages, in the case of an established business with an established earning capacity."); Guard v. P&R Enters., Inc., 631 P.2d 1068, 1072 (Alaska 1981) ("In cases involving an established business, courts have considered past profits a reasonably certain measure by which to calculate a damage award."); Schoenberg v. Forrest, 228 S.W.2d 556, 560-61 (Tex. Ct. App. 1950) ("Where . . . it is shown that the business . . . was making a profit[] when the contract was breached, such pre-existing profit, together with other facts and circumstances, may be considered in arriving at a just estimate of the amount of profit which would have been made if plaintiff had not breached its contract." (quotation and citation omitted)).

26

By using the Shops' actual past performance to calculate projected future royalties and advertising fund contributions, Meineke did not fall into the sort of analysis North Carolina courts have rejected as being too remote, hypothetical, or based on conjecture.  E.g., McNamara, 466 S.E.2d at 330 (concluding calculations were not reasonably certain where they were based on nationwide data from stores who "bore [no clear] similarity to plaintiff's business" rather than "sales figures and other financial data" from smaller stores of plaintiff's kind or similar stores in the region); Olivetti, 356 S.E.2d at 586-87 (concluding lost profits calculation not made with reasonable certainty where it was based on being offered an opportunity that was turned down and then the subsequent profitability of that opportunity where there was no evidence in the record to support either contingency).  To the contrary, Meineke's calculations were "based upon standards that allowed the jury to determine the amount of plaintiff's lost profits with reasonable certainty."[13]  McNamara, 466 S.E.2d at 330.

---

[13]  The Shops closed at different periods into their terms, and thus had different lengths of past performance on which to base Meineke's calculations.  However, in Olivetti, the Supreme Court of North Carolina rejected the "new business" rule, which would have "preclude[d] an award of damages for lost profits where the allegedly damaged party has no recent record of profitability," 356 S.E.2d at 585, either due to being a "recently . . . instituted" business or an established business "without a recent history of profitability."  Id. at 585 & n.3. (Continued)

27

RLB's arguments challenging the amount of future damages Meineke seeks, including the three-year period for which it seeks such damages, create a question of disputed fact as to whether Meineke's calculations reflect the time period for which there is a reasonable certainty as to what lost profits would have been received by Meineke. But Meineke's methodology was not unreasonably speculative, hypothetical, or the result of conjecture as a matter of law. Thus, summary judgment on this issue was erroneous as material facts remain in dispute as to the amount of future damages and the time period for which they are collectible.

4.

The district court next held that "[f]uture damages were not reasonably within the contemplation of the parties at the time of" entering into the FTAs because "[i]f they had been, Meineke would have contractually provided for them." (J.A. 834.) The court stated "[i]t would be unjust to construe the FTAs as permitting future damages when the words [do not] provide for them." (J.A. 834.)

_____

Instead, the court held that lost profits could be awarded to any business – regardless of age or history of recent profitability – as long as damages were proven "with reasonable certainty." Id. at 585.

28

Meineke contends this was error because "[t]he fact that the [FTAs do] not expressly list each available remedy for such a breach does not preclude Meineke from seeking the customary breach of contract remedies, including lost future royalties and advertising [fund] contributions, allowed by the black letter law of contracts." (Appellant's Br. 35.)  Moreover, Meineke posits "it was reasonably foreseeable that if [RLB] stopped operating [its] franchises before the expiration of the 15-year term, Meineke would seek to recover the remaining royalties and advertising [fund] contributions due to Meineke under the [FTAs]." (Appellant's Br. 34.)

As previously noted, to recover future damages, such damages must "be reasonably supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of a breach." Perkins, 74 S.E.2d at 644; see also Lamm v. Shingleton, 55 S.E.2d 810, 812-13 (N.C. 1949) ("A party to a contract who is injured by another's breach of contract is entitled to recover from the latter damages for all injuries and only such injuries as are the direct, natural, and proximate result of the breach . . . and can reasonably be said to have been foreseen, contemplated, or expected by the parties at the time when they made the contract as a probable or natural result of a breach." (quotation and citations omitted)).  "In ascertaining what damages come within the rule, it is proper to

29

examine, not only the terms of the contract, the subject-matter, etc., but also to inquire whether such circumstances or conditions as produced special damages were communicated to the defendant." Storey, 100 S.E. at 691.

It was an error of law for the district court to base its analysis solely on whether prospective damages were explicitly provided for in the terms of the FTAs. Demanding such express evidence of contemplation requires more than proof that lost profits were "reasonably supposed to have been" within the parties' contemplation, and instead requires absolute certainty that the parties considered such terms by including them in their written agreement. We could find no cases – and neither the district court nor RLB cite to any – where North Carolina courts have held parties to such a high standard of proof. Indeed, the principles espoused above clearly negate such a proposition, focusing instead on what damages are within the contemplation and expectation of the parties, and those that are naturally and likely resulting from a breach. North Carolina courts have typically articulated the principles regarding what damages are generally recoverable following a breach of contract in contrast to special circumstances that may lead to a different recovery, which must have been specifically discussed in order to be considered part of the parties' contemplation at the time of entering into the agreement. Perkins, 74 S.E.2d at

30

643-44. The requirement that lost profits be "reasonably supposed to have been within the contemplation of the parties" incorporates this notion of naturally arising from a breach, but does not require express written agreement. Cf. id. at 644. Thus, while the absence of such an express lost profits provision in the contract is one fact the court may consider in determining whether the parties reasonably contemplated future damages, cf. Storey, 100 S.E. at 691, it is not the only evidence relevant to the determination. The district court erred in relying on that evidence alone to conclude that the parties did not contemplate lost profits as damages.

The record reflects several relevant factors that could support a contrary conclusion, including the FTAs' fifteen-year terms and the grant of an exclusive territorial right. Moreover, the entire purpose of the FTA was to establish a binding agreement whereby RLB paid Meineke royalties and advertising fund contributions in exchange for being permitted to operate under its name and marks, using its procedures and products. At the very least, this evidence juxtaposed against the absence of an explicit FTA provision specifying the recovery of future damages creates a disputed issue of fact about whether Meineke's lost royalties and advertising fund contributions in the event of a breach were reasonably within RLB and Meineke's contemplation at the time they entered into the FTAs.

31

Accordingly, the district court erred in holding that RLB was entitled to judgment as a matter of law as to this aspect of Meineke's claim.

### 5.

Lastly, with respect to mitigation of damages, the district court concluded the record held "no evidence that Meineke attempted to mitigate its damages under the FTAs by re-franchising." (J.A. 834.) Citing the Supreme Court of North Carolina's decision in Miller v. Miller, 160 S.E.2d 65, 73-74 (N.C. 1968), the district court held that Meineke's failure to mitigate "operates as a bar to recovery." (J.A. 834.) The court's quotation from Miller is incomplete and thus does not correctly state the North Carolina law regarding mitigation:

> The rule in North Carolina is that an injured plaintiff, whether his case be tort or contract, must exercise reasonable care and diligence to avoid or lessen the consequences of the defendant's wrong. If he fails to do so, for any part of the loss incident to such failure, no recovery can be had. This rule is known as the doctrine of avoidable consequences or the duty to minimize damages. Failure to minimize damages does not bar the remedy; it goes only to the amount of damages recoverable.

Id. at 73-74 (internal citation omitted) (emphasis added). The district court thus erred as a matter of North Carolina law because Meineke's failure to mitigate, if such be ultimately

32

found, does <u>not</u> bar recovery of prospective damages, but only circumscribes the amount of damages that may be recovered.

In asserting a failure to mitigate defense, the burden was on RLB to allege and prove that Meineke failed to "do what reasonable business prudence required to minimize [its] damage." <u>Mt. Gilead Cotton Oil Col. v. W. Union Tel. Co.</u>, 89 S.E. 21, 22 (N.C. 1916); <u>see also</u> <u>United Labs., Inc. v. Kuykendall</u>, 403 S.E.2d 104, 108 (N.C. Ct. App. 1991) (holding an injured plaintiff "must exercise reasonable care and diligence to avoid or lessen the consequences of the defendant's wrong" (quotation and citation omitted)). To avoid denial of its motion for summary judgment based on a failure to mitigate, RLB would have had to put on some evidence that Meineke's duty to mitigate arose contemporaneously with any damages arising from the breach. RLB did not offer any such proof, and instead more broadly claimed that Meineke was simply not entitled to the amount of damages it sought because of a failure to mitigate. In effect, RLB's position is that Meineke was required to prove, even as to the first day after RLB's breach, that Meineke acted in mitigation. This argument reverses the burden of proof under North Carolina law.

Meineke responded to this assertion with evidence contending that it adequately mitigated its damages by only seeking damages for a three-year period rather than for the each

33

FTA's remaining term, and that it would have cost more to specifically seek to refranchise the exact area of each of the shops rather than continuing to market the availability of nationwide franchises.[14]  This evidence creates an issue of disputed fact as to whether, under the circumstances of this case, the three-year period satisfies the duty to mitigate and, if not, what period of prospective damages between one day and three years Meineke was entitled to recover before its failure to mitigate barred further recovery.  Accordingly, the district court erred in its ruling on mitigation.

IV.

For the aforementioned reasons, we conclude that the FTAs do not bar Meineke from recovering future damages, that RLB's breach proximately caused Meineke to incur prospective damages, and that Meineke put forth sufficient evidence to create issues of disputed fact on its claim for lost profits.  Accordingly, the district court erred in granting summary judgment to RLB on

---

[14] For example, in deposition testimony, Meineke's Chief Financial Officer, Michael Carlet, explained that Meineke "typically do[es] not try to refranchise a specific territory" "[b]ecause the incremental cost to find a franchisee for that specific territory would not be cost beneficial." (J.A. 503.) He explained "[t]he cost to target a market on a specific basis, to find the advertising source in that market, and to find a franchisee is much more expensive than the other methods of advertising that [Meineke] use[s] to attract franchisees." (J.A. 503; see also 503-06.)

34

the issue of prospective damages.  We therefore reverse the district court's grant of summary judgment to RLB as to Meineke's future damages claim and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED

35